FERNÁNDEZ, DEMANDANTE Y APELADA, *v.* CASALDUC, DEMANDADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección Primera, en pleito sobre divorcio.

No. 2290.—Resuelto en julio 9, 1921.

DIVORCIO—TRATO CRUEL—ACCIÓN POR LA MUJER—VIOLENCIA—SUFRIMIENTO MENTAL.—En las acciones de divorcio fundadas en el trato cruel cuando la mujer

lo alega no necesita presentar un caso tan claro, de violencia o sufrimiento mental como el que tendría que presentar el marido de ser él el demandante.

ID.—RECONCILIACIÓN—COHABITACIÓN—ACCIÓN BASADA EN ACTOS POSTERIORES—ALEGACIÓN DE ACTOS ANTERIORES EN CORROBORACIÓN.—Aún suponiendo que haya habido reconciliación, un cónyuge puede después de ella establecer una acción de divorcio por trato cruel derivado de actos posteriores, alegando en corroboración los actos anteriores a tal supuesta reconciliación.

ID.—INCOMPATIBILIDAD DE CARACTERES—TRATO CRUEL.—Aunque la mera incompatibilidad de caracteres no constituye en sí fundamento de divorcio, al resolver si las circunstancias demuestran crueldad debe tenerse siempre en cuenta la inteligencia, educación aparente y sentimientos de la parte ofendida.

Los hechos están expresados en la opinión.

Abogados de la apelada: *Sres. C. Iriarte, Jr. y F. H. Dexter.*

Abogados del apelante: *Sres. C. Coll Cuchí y G. Cruzado Silva.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

Apela el demandado de una sentencia de divorcio y en varios períodos de la argumentación hecha en su alegato, aunque sin hacer señalamientos de error por separado, sugiere lo siguiente:

"La Corte de Distrito de San Juan, Sección Primera, erró al declarar sin lugar la excepción previa de falta de causa de acción interpuesta por el demandado contra la demanda.

"La Corte de Distrito de San Juan, Sección Primera, cometió error al declarar sin lugar la moción de *non suit* presentada por el demandado, una vez terminada la prueba de la demandante por el siguiente motivo: porque tomando en consideración toda la prueba aducida en el juicio por la demandante ésta no ha sido suficiente para establecer su caso *prima facie.*

"La Corte de Distrito de San Juan, Sección Primera, cometió un grave error al declarar sin lugar la petición de suspensión formulada por el demandado mientras prestaba su declaración el testigo don Alberto Bruci y al no permitir que el abogado del demandado presentara bajo juramento sus declaraciones para demostrar los motivos por los cuales solicitaba dicha suspensión, y cuyo motivo era que la parte demandada había sido en esos momentos sorprendida por la declaración del citado testigo, habiendo dicho testigo inducido al propio demandado a creer que había de declarar sobre manifesta-

ciones directas hechas por la propia doña Francisca Látimer en Arecibo, en los mediados del año 1916, la víspera de la salida de doña Carmen Fernández para San Juan, en el sentido de que pedía a dicho testigo Sr. Bruci consejos en cuanto al derecho, a la posibilidad de ella, llevar a la hija y a los hijos de doña Carmen Fernández a San Juan, sin el consentimiento y sin el permiso del demandado Sr. Casalduc; por cuanto la corte apesar de haberse alegado por la parte demandada la sorpresa de dicho testigo y de haber solicitado por tal fundamento la suspensión del caso para demostrar tal extremo por declaraciones juradas, declaró sin lugar dicha moción de suspensión y privó al demandado de explicar las manifestaciones hechas por el Sr. Bruci al abogado del demandado privándolo así del derecho que tiene un demandado a defenderse de una sorpresa en el acto de un juicio.''

El primer señalamiento se funda en el artículo 171 del Código Civil, el cual prescribe que ''la acción de divorcio se extinguirá por reconciliación de las partes.'' Pero el artículo que sigue inmediatamente prescribe que:

''En caso de reconciliación, el demandante no podrá ejercitar o continuar ejerciendo la acción que tuviere, pero queda en libertad de promover nuevo juicio por motivos ocurridos después de la reconciliación y en tal caso podrá alegar las anteriores causas para corroborar su nueva acción.''

Se citan los casos de *Figueroa v. Pierluisi,* 25 D. P. R. 496; *Fernández* v. *Hernández,* 2 Sentencias de Puerto Rico, 332; *Quiñones* v. *Rodríguez,* 9 D. P. R. 322, y varios textos legales, con bastante extensión, al efecto de que ellos indican lo que constituye extremado trato cruel.

En cada uno de estos casos que acabamos de citar el marido era demandante y el trato cruel en cuestión se alegó que fué inferido por la esposa. Y como se indica en el caso más reciente de *Dueño* v. *Dueño,* 28 D. P. R. 977, no sólo los actos de crueldad, y no solamente la subsiguiente mala conducta puede ser de carácter más leve que la que constituiría la primitiva crueldad, sino que también tanto la condonación como la renovación de los actos de crueldad son menos fá-

ciles de presumirse contra la esposa que contra el marido. Asimismo los casos que han sido resueltos sin diferencia de opinión en cuanto a la cuestión como ha sido discutida, parecen haber establecido como regla general que el marido que solicita un divorcio por el fundamento de crueldad "debe presentar un caso más claro de violencia o sufrimiento mental que perjudiquen seriamente a su salud, que no la esposa." 19 C. J. 144, sección 367, y casos citados.

En el presente caso la esposa, como demandante, alegó lo siguiente:

"II. Que la demandante contrajo matrimonio con el demandado en la ciudad de San Juan el día 22 de junio de 1910 por el Rito Católico Apostólico Romano.

"III. La demandante alega que durante su matrimonio con el demandado ha procreado tres hijos llamados:

"Víctor Alberto que nació el día 12 de abril de 1911.

"Laura Hilda que nació el día 23 de mayo de 1912.

"Alfredo que nació el día 31 de julio de 1913.

"IV. Alega la demandante que vivió en harmonía con el demandado en la ciudad de San Juan hasta el año 1912, en que la conducta y actitud del demandado hacia ella cambió radicalmente dando por resultado que el demandado en vez de tratar a la demandante con la consideración y el afecto que merece ser tratada una esposa por su esposo, la conducta del demandado empezó a ser tan cruel e inusitada que causó la intranquilidad de la vida conyugal hasta hacerla insoportable, destruyendo así la felicidad de la demandante, y hasta tal punto llegó el constante sufrimiento de la demandante que ésta enfermó de gravedad, habiendo de este modo anulado el demandado los legítimos fines del matrimonio.

"V. Después del matrimonio de la demandante con el demandado, se fueron a vivir a Arecibo hasta el año 1916, en que se trasladaron a San Juan. Tan pronto como nació el segundo niño, en el año 1912, el demandado, sin motivo alguno que lo justificara, dejó de hablar a la demandante durante un mes, causándole con esto grandes mortificaciones y sufrimientos.

"VI. En cierta ocasión, cuando contrajo matrimonio Bárbara, una hermana de la demandante, ésta manifestó a su esposo que deseaba asistir a dicha boda, pero él se negó rotundamente a que ella hiciera

tal cosa. Después, a súplicas de una hermana de la demandante que fué a Arecibo con el fin de que ella viniera a la boda a San Juan, el demandado accedió, pero demostrando disgusto y mal humor por haber dado tal consentimiento. Cuando la demandante regresó a Arecibo, el demandado la recibió con maneras descorteses, y por espacio de varias semanas estuvo sin hablarle.

"VII. En el mes de abril de 1915, el demandado abrió una carta que iba dirigida a la demandante por su hermana Bárbara, sin la demandante saberlo ni haberlo autorizado para que lo hiciera, y por dicha carta el demandado cesó de hablarle durante dos meses.

"En esa época de disgusto y silencio, el demandado estaba constantemente ausente del hogar, y regresaba a dormir a las diez u once de la noche. En ese tiempo el demandado requería a la demandante para que le preparara la comida y durante el tiempo que él estaba en la mesa no le hablaba a la demandante, haciendo caso omiso de ella y sin demostrarle ninguna clase de consideración. Estas cosas las hacía públicamente, en presencia de los vecinos y criados.

"VIII. Alega la demandante que en el año 1915, la demandante y el demandado vinieron a San Juan con el fin de firmar ciertos documentos en relación con la testamentaría del difunto padre de la demandante que le había dejado a ella y a sus hermanos una herencia.

"Durante la tramitación de esa documentación el demandado tuvo una discusión con Alfonso, un hermano de la demandada, por un asunto trivial, y el demandado por este motivo insignificante le ordenó a la demandante que desde aquel momento rompiera toda clase de relaciones con su hermano Alfonso y la esposa de éste.

"IX. En el mes de marzo de 1915, Jorge, un hermano de la demandante estuvo gravemente enfermo. La víspera de su muerte, habiendo sido avisada la demandante del estado de su hermano por su familia en San Juan, ella solicitó del demandado permiso para venir a visitar a su hermano, pero el demandado le negó el permiso. Unicamente debido a la intervención de la hermana del demandado se debió el que él finalmente concediera el permiso para que la demandante viniera a San Juan en compañía de la referida hermana de su esposo. La demandante llegó después de la muerte de su hermano y solamente pudo asistir a sus funerales.

"X. Cuando la demandante retornó a Arecibo con la hermana de su esposo, Alfonso, el hermano de la demandante, las acompañó en su automóvil hasta la residencia de un tío de la demandante, don Pedro Fernández, cerca del pueblo de Bayamón.

"Cuando la demandante llegó a Arecibo, el demandado la recibió

con frialdad y descortesía y por un período de dos o tres meses dejó de hablar a la demandante.

"Algún tiempo después el demandado manifestó a la demandante que esto fué debido a que ella dejó que su hermano Alfonso la acompañara hasta casa de su tío.

"XI. En el mes de mayo de 1916, la demandante recibió una carta de su hermana Blanca en cuya carta ésta le informaba que tenía en proyecto pagarle a la demandante una visita. Cuando el demandado se enteró de esta carta le prohibió terminantemente a la demandante que recibiera visitas de sus familiares y le dijo a la demandante que le escribiera a su hermana que no fuera a Arecibo.

"En esta época la demandante estaba muy delicada de salud y como la conducta de su esposo estaba causándole un gran sufrimiento físico y moral ella requirió la presencia y consuelo de su familia. Por esta razón su hermana Blanca proyectaba hacerle un visita.

"La demandante no le prohibió a su hermana que le hiciera la visita que le había propuesto y al poco tiempo ésta llegó a Arecibo.

"A la mañana siguiente de su llegada, el demandado arregló sus maletas indicando que se iba a hacer un viaje, pero sin haberle dicho absolutamente nada a la demandante ni haberle indicado cuáles eran sus intenciones.

"Cuando el demandado llegó a Utuado le puso un telegrama a Blanca, la hermana de la demandante, diciéndole que se fuera de su casa. Pero como la salud de la demandante era de cuidado, la hermana de la demandante no quiso dejarla en tales condiciones y se quedó hasta la próxima semana, que llegó el demandado a Arecibo.

"Cuando él entró a la casa formó un gran escándalo, tirando los muebles y haciendo mucho ruido, todo esto le causó un gran sufrimiento físico y moral a la demandante y como resultado cayó gravemente enferma.

"XII. Enterada la madre de la demandante, doña Francisca Látimer viuda de Fernández, de la gravedad de ésta, fué a Arecibo para cuidarla. Cuando la madre de la demandante llegó, el demandado hizo demostraciones de disgusto y descontento y empezó a hacer preparativos para irse de la casa.

"El demandado no saludó a la madre de la demandante ni le habló a la demandante. Al día siguiente el demandado entró en la habitación de la demandante, empujando la puerta con gran violencia y estruendo y le dijo: 'Como tú te ocupas más de tu familia que de mí y de los niños yo te doy mi permiso para que regreses a San Juan con tu madre.' La demandante creyó que el demandado

había decidido terminar sus relaciones conyugales y devolverla a su familia. Esto le causó a la demandante un ataque nervioso que la obligó a estar en cama durante varias semanas bajo el cuidado y la atención de su madre.

"Durante este tiempo el demandado no le habló a la demandante ni preguntó cómo estaba.

"XIII. Las condiciones de la demandante eran de tal cuidado, que la madre de la demandante creyó necesario traerla a San Juan en donde ella podría recibir el cuidado y los consuelos de su familia y la atención de los médicos, pues el demandado nunca quiso llevarle un médico a la demandante porque decía que no era necesario.

"Cuando el demandado vió el baúl de la demandante preparado para venir a San Juan, él le envió a la demandante una orden escrita en maquinilla diciéndole que se preparara para ir inmediatamente con él a Utuado.

"A esta orden la demandante le contestó una cartita, la que fué dictada por el padre del demandado, en la que le decía que le era absolutamente necesario ir a San Juan por poco tiempo con el fin de recobrar su salud y descansar su mente.

"La conducta y maltrato del demandado agravó el estado de la demandante al extremo de agravarse tanto que estuvo a punto de morir.

"Como resultado de la opinión del Dr. Susoni quien fué llamado para atender a la demandante y a la que encontró en muy malas condiciones, el demandado finalmente consintió en que ella viniera a San Juan.

"La demandante estuvo en San Juan, en la casa de 'su madre, por espacio de dos años, durante los cuales el demandado dejó de suministrarle lo necesario para su cuido y sostenimiento.

"XIV. En el mes de octubre de 1917, el demandado vino a San Juan y vivió con la familia de la demandante hasta agosto de 1918, y durante ese tiempo, el demandado no le pagó nada a la familia de la demandante por la casa y la manutención de él y de la demandante, y además las medicinas y el médico que utilizó la demandante durante el tiempo que estuvo enferma; pero dichos gastos fueron pagados por la demandante de su propio peculio.

"XV. En el mes de octubre de 1918, cuando los temblores de tierra azotaron la isla, la demandante visitaba la iglesia de su religión, acompañada de sus hijos, para consolar su espíritu. Cuando el demandado se enteró de esto le escribió a la demandante una carta prohibiéndole a los niños que fueran a la iglesia, cualquiera que

fuera la religión o secta a que fueran, pues él estaba en contra de todas las religiones. Durante el transcurso del año siguiente, el demandado ha tenido frecuentes períodos de tiempo en que ha dejado de hablarle a la demandante, sin haber motivo alguno para ello, y le ha escrito cartas que le han causado grave daño corporal y mental a la demandante.

"XVI. En el mes de septiembre de 1919, la demandante sufrió una caída que le causó una gran contusión en una de las piernas. Esto dió motivo a que le saliera un tumor que le ocasionó un gran sufrimiento a la demandante por lo que requería los servicios de un médico, pero el demandado se negó a proporcionarle un médico a la demandante.

"Finalmente, viendo las condiciones en que se encontraba, se llamó a un médico y él ordenó que fuera inmediatamente conducida a un hospital a operarla. El día 28 de septiembre de 1919, la demandante fué conducida a la Clínica Miramar en donde fué operada, pero el demandado no se ocupó de ella y se negó a acompañarla. Tampoco preguntó por ella ni trató de verla durante el tiempo que estuvo en el hospital, ni ha querido pagar los gastos que hizo la demandante en el hospital; todo esto fué pagado por la demandante de su propio peculio.

"XVII. Después de la demandante haber regresado a su casa, un día mandó sus hijos al Parque Borinquen con un miembro de su familia. Enterado el demandado de esto, le prohibió a la demandante que dejara salir los niños con su familia a ninguna parte.

"XVIII. El día 15 de octubre de 1919, el demandado sin motivo alguno para ello, usó un lenguaje duro y amenazador para con la demandante y la trató cruelmente, agarrándola bruscamente por los brazos y después la tiró a un lado, estando la demandante entonces, como lo está ahora, en un estado muy delicado de salud y sumamente débil."

Admitiendo en pro del argumento, aunque sin resolverlo, que la alegación décimacuarta implica una condonación de todos los actos imputados en los anteriores párrafos, sin embargo a la luz de las reglas y definiciones arriba citadas, no podemos decir que la conducta de que se queja la demandante en la décimaquinta, décimasexta, décimaséptima y décimaoctava alegaciones es inadecuada para renovar los incidentes anteriores los cuales insiste el apelante, de la faz

de la demanda aparece que fueron condonados. Y aparte de la cuestión de la condonación no se alega, si puede formalmente alegarse, que la demanda no determina en absoluto una causa de acción.

El segundo señalamiento carece asimismo de méritos. No solamente los hechos alegados en la demanda han sido completamente probados, sino que en algunos la prueba en su profusión de detalles va aún más lejos que la alegación, revelando circunstancias agravantes que robustecen más la declaración moderada contenida en la alegación. Un sólo ejemplo servirá para explicar este punto. De la declaración de la demandante en cuanto al incidente a que se hace referencia en la alegación séptima, *supra,* transcribimos lo siguiente:

"¿En el mes de abril del año 1915 le ocurrió algo a Ud. con su esposo por motivo de una carta de su hermana Bárbara?—Sí, señor.

"¿Qué fué lo que pasó?—Una hermana mía me escribió una carta y él sin yo haberlo autorizado para que la abriera cogió y la abrió y la leyó, y esto fué motivo para que no me dirigiera más la palabra.

"¿Cuánto tiempo estuvo sin dirigirle la palabra?—Dos meses, y fué tan cruel que cogió y copió los párrafos de la carta de mi hermana y cuando yo salía venía y me los encontraba puestos en el espejo y en el plato de comida, copiados en maquinilla los párrafos.

"¿Qué impresión le producía a Ud. el encontrarse debajo del plato de comida esos pedazos de papel copiados en maquinilla con los párrafos de la carta de su hermana y en los espejos que Ud. ha dicho?—Para mí era un sufrimiento terrible.

"¿Cuánto tiempo le hizo eso?—Lo estuvo haciendo cada vez que yo salía.

"¿Por cuánto tiempo?—Por varias semanas.

"¿Durante ese tiempo conservó con Ud. buenas relaciones?—Ningunas; se sentaba a la mesa y no me dirigía la palabra, no se ocupaba de mí para nada. Yo sufrí tanto en esos días que tuve que llamar a mi cuñado, el esposo de mi hermana, para que viniera a ver si podía hacer que él volviera a hablarme.

"¿Esos papeles que dice Ud. que le ponía debajo del plato y en los espejos en qué forma hacía él eso, lo hacía privadamente con Ud.

cuando se sentaba o lo hacía en presencia de algunas otras personas?—En presencia de las sirvientas.''

La naturaleza meditada, voluntaria y deliberada de tal conducta se destaca al momento y es bastante para separar la presente controversia de la clase de casos en que se resuelve que ''la mera austeridad de carácter, malas formas, rudeza de lenguaje, o hasta los arranques ocasionales de pasión, si no amenazan daño corporal, o perjuicio a la salud, por regla general no implican crueldad.''    9 R. C. L., página 337, sección 116.

Estamos de acuerdo con los hechos declarados probados por el juez sentenciador, los cuales son como sigue:

''Examinada la prueba, la corte entiende que se han probado los hechos esenciales de la demanda, y que la conducta del demandado para con su esposa, constituye el trato cruel a que hace referencia el artículo 164 del Código Civil.

''Indudablemente que no merece otra calificación la conducta de un esposo que sin causa justificada deja de hablarle a su esposa durante un período de un par de meses, dando lugar a que los vecinos y el servicio de la casa, se dé cuenta de la poca armonía que reina en el matrimonio; que cada vez que un familiar de su esposa escribe, o se presente en la casa, sea un motivo para que el esposo deje de hablarle y para que abandone el hogar, y si a estos hechos añadimos que entendemos que ha sido probado, que sin causa justa y en presencia de los sirvientes agarró de una manera brusca a su esposa, y la tiró de un lado, y estimamos como un hecho probado que la esposa siempre ha gozado de poca salud, y que pertenece a la buena sociedad, circunstancias que indudablemente influyen en gran manera para que la conducta de su esposo afectara de una manera notable a sus sentimientos y a su estado físico, destruyendo la tranquilidad de espíritu y a la felicidad de la demandante, convendríamos con ella en que le es imposible vivir por más tiempo con el demandado, y en su consecuencia, debemos declarar y declaramos con lugar la demanda, roto y disuelto el vínculo matrimonial existente entre doña Carmen Fernández y el Dr. Lorenzo Casalduc, quedando los hijos bajo la *patria potestad* de la madre; e imponiendo las costas y honorarios de abogado al demandado.''

Como restricción a la regla relativa a la mera incompatibilidad de caracteres que pueda servir de base a un divorcio, encontramos en el tomo y página referidos en último lugar, sección 117, lo siguiente:

"Pero aunque la mera incompatibilidad de carácter no constituye por sí fundamento de divorcio, está bien reconocido, especialmente en los casos modernos, que el jurado, o la corte que juzga los hechos, al resolver si las circunstancias demuestran crueldad siempre debe tener en cuenta la inteligencia, educación aparente, y delicadeza de sentimientos de la parte demandante."

También se dice:

"Las cortes reconocen enteramente que no ha de tomarse en consideración completamente el aspecto físico y sensual del matrimonio, sino que tal matrimonio en su aspecto legal tienda también a la felicidad social y goce moral de aquéllos que están unidos por él. Se considera, por tanto, la conducta adusta e insocial de la parte demandada al resolver si esta última ha sido culpable de crueldad. Sin embargo, parece que la mera insociabilidad por parte de cualquiera de los esposos no puede por sí considerarse como crueldad, y en un caso que parece estar más libre de hechos colaterales que la mayoría de los casos, se resolvió que un divorcio no se decretaría por motivo de crueldad porque un hombre que trabajaba fuera de la casa por largas horas durante el día, incluyendo los domingos, como vigilante en un cruce de ferrocarril, al volver a la casa después de su trabajo prefería ponerse a leer o irse a acostar en vez de hablar con su señora, llevarla a distracciones o visitar a los amigos. Por otra parte, se ha resuelto que la prueba de que el marido y la mujer hubiesen vivido en la misma casa y comido juntos el alimento preparado por ella, sin él hablarle a ella como no fuera encolerizado, conducta que observó una vez por espacio de tres meses, era suficiente para establecer trato cruel e inhumano por su parte y justificar a la corte en decretar el divorcio a favor de ella." *Idem*, pág. 348, sec. 130.

Aún en las jurisdicciones donde el perjuicio a la salud es un elemento esencial, encontramos lo siguiente:

"En la mayoría de los casos las cortes han resuelto que un precepto estatutorio que prescribe la conducta perjudicial a la salud

como fundamento de divorcio, no exige el empleo de violencia física, sino que aquella conducta, violenta o de otra naturaleza, la cual, bajo todas las circunstancias del caso, ponga en peligro la vida, es lo que con ello se pretende.'' Nota al caso de *Thompson* v. *Thompson,* 5 A. S. R. 712.

*    *    *    *    *    *    *

Y se ha dicho que ''el perjudicar a la salud es poner en peligro la vida.'' *Cole* v. *Cole,* (1867) 23 Iowa, 433, citado en la nota últimamente referida.

Véase también la opinión en el caso publicado (*Thompson* v. *Thompson*).

El razonamiento contenido en el tercer señalamiento de error, sin demostración alguna de perjuicio, y sin ninguna teoría bien definida o inteligible, citas de autoridades para sostener la proposición como ha sido enunciada, *supra,* gire dentro de una amplia e inconexa discusión de la prueba, la cual, como ya hemos sugerido, es más que suficiente para sostener las conclusiones de la corte inferior.

La sentencia apelada debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

El Juez Asociado Sr. Wolf no intervino en la resolución de este caso.